717 P.2d 449

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, a corporation, Plaintiff-Appellant,

v.

Joseph K. BOGART and Donna M. Bogart, his wife; the Hertz Corporation, a Delaware corporation; Employers Insurance of Wausau, a mutual company; John J. May and Margaret May, his wife, Defendants-Appellees.

No. 18116–PR.

Supreme Court of Arizona, En Banc.

March 27, 1986.

Hofmann, Salcito, Stevens & Myers by Leroy W. Hofmann, Phoenix, for plaintiff-appellant.

Leonard & Clancy by Kenneth P. Clancy, Phoenix, for defendants-appellees Bogart.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by Noreen L. Sharp, Phoenix, for defendant-appellee Hertz Corp.

Browder & Kenney by Robert W. Browder, Phoenix, for defendant-appellee Employers Ins. of Wausau.

FELDMAN, Justice.

We have accepted review of this declaratory judgment action to resolve an apparent conflict between "other insurance" clauses in two insurance policies. One policy contains an "escape clause" and the other an "excess clause." Both policies are potentially applicable to the same occurrence. The trial court granted summary judgment and ordered that the loss be prorated between the two insurers in the proportion which the limits of each policy bear to the total available limits. The court of appeals reversed, giving full effect to the escape clause. *State Farm Mutual Auto Insurance Co. v. Bogart*, 149 Ariz. 154, 717 P.2d 458 (1985). Since the case raises issues of first impression in Arizona, we granted review pursuant to Rule 23, Ariz.R.Civ.App.P., 17A A.R.S. We have jurisdiction pursuant to Ariz. Const. art. 6, § 5(3), A.R.S. §§ 12–1837 and 12–120.24.

## FACTS

On October 2, 1978, John May (May) rented an automobile from a Maricopa County office of the Hertz Corporation (Hertz). May was in Arizona on business for his employer, the Xerox Corporation (Xerox). While driving the car on Xerox business, May was involved in an accident with Mr. and Mrs. Bogart (the Bogarts), both of whom were injured. The insurance situation with respect to the rented car was as follows:

1. Hertz is required by statute to provide liability insurance coverage for the drivers of cars which it owns and rents. *See* A.R.S. § 28–324. However, Hertz avoided this requirement by qualifying as an Arizona self-insurer pursuant to A.R.S. § 28–1222.

2. Xerox had purchased a comprehensive automobile liability policy providing both owned and non-owned automobile coverage from the Employers Insurance Company of Wausau (Employers). It included an endorsement specifically covering Xerox employees as insureds, "but with respect to a non-owned automobile only while such automobile is being used in the business of [Xerox]."

3. May was a named insured on an owner's liability insurance policy issued to him on his personal automobile by State Farm Mutual Automobile Insurance Company (State Farm). This policy also provided May with non-owned vehicle coverage.

The Bogarts brought a damage action against May. Hertz defended him and eventually settled with the Bogarts for $200,000, the maximum amount for which

Hertz was responsible under its car rental contract. As part of the settlement the Bogarts agreed not to execute against May's personal assets.

May's defense was then taken over by both State Farm and Employers. Eventually the Bogarts obtained a judgment of $609,198. Subtracting the $200,000 paid by Hertz, May was liable for an additional $409,198. The Employers policy provided $500,000 in coverage for the occurrence in question, while the State Farm policy provided coverage of $200,000. If the State Farm policy is applicable, there is a total of $700,000 in coverage.

State Farm refused to pay any part of the judgment and filed a declaratory judgment action (A.R.S. § 12-1831 *et seq*). It asked the court to find its "escape clause" valid and to hold, therefore, that State Farm provided no coverage. Employers counterclaimed, requesting that the court find that State Farm did provide coverage for this occurrence and that any coverage provided by Employers was not only excess as to Hertz but was also excess as to State Farm.

The trial judge ruled on cross-motions for summary judgment. He held that State Farm's escape clause was unenforceable and that Employers' coverage was not excess to State Farm. The judgment finds that both Employers and State Farm are *primary* carriers and holds that payment of the unpaid balance of the judgment is to be prorated, two-sevenths to State Farm and five-sevenths to Employers.

State Farm appealed. The court of appeals reversed, holding that Hertz provided primary coverage and that both State Farm and Employers were therefore excess carriers. The court then held that State Farm's escape clause was valid and applicable; thus, Employers must pay the entire unpaid balance of the judgment. Employers petitioned for review, arguing that the declaratory judgment should be affirmed.

## THE "OTHER INSURANCE" CLAUSE

No field of insurance law has been so perplexing and productive of litigation as the battles between alleged excess carriers seeking contribution or escape from payment of losses. *State Farm Mutual Automobile Insurance Co. v. United States Fidelity and Guaranty Co.*, 490 F.2d 407, 410 (4th Cir.1974). Because we believe it will shed some light on the proper disposition of the issues before us, we first consider the purpose and nature of "other insurance" clauses. These clauses originated in property insurance and were initially inserted to discourage an insured from over-insuring against a particular loss. *Sloviaczek v. Estate of Puckett*, 98 Idaho 371, 372-73, 565 P.2d 564, 566 (1977). Thus, the idea of reducing an insurer's liability where there was "other insurance" covering the loss originally protected the insurer against fraudulent recovery. *Id.* Nevertheless, "other insurance" provisions came to be included in many liability policies even though the possibility of over-insurance inducing fraudulent claims was remote in such losses. *Id.* As automobile insurance policies began to provide protection beyond coverage for a specific insured and vehicle, multiple coverage situations became common. As a result, many losses are covered by more than one policy, thus triggering "other insurance" clauses which are now standard in most insurance policies.

"Other insurance" clauses fall into three general categories. First is the excess clause which states that the insurer provides liability coverage only for amounts due after all other available insurance has been exhausted. Second is the prorata clause, limiting the insurer's liability to a share of the loss to be determined by the proportion that the insurer's policy limit bears to the aggregate of available limits. Third are escape clauses, which provide that a policy which would otherwise cover the loss will afford no coverage at all in the event that there is other insurance available. *State Farm v. United States Fidelity and Guaranty Co.*, 490 F.2d at 410; Comment, *Double Insurance Coverage in Automobile Insurance Policies—The Problem of "Other Insurance" Clauses*, 47 TUL.L.REV. 1039 (1973).

With this brief background, we now turn to the clauses in question. The Employers policy provided primary coverage for Xerox employees in almost every situation, except it expressly provided as follows:

> With respect to a hired automobile, or a non-owned automobile, this insurance shall be excess insurance over any other valid and collectible insurance available to the insured. (emphasis omitted)

This is a true excess clause, obviously intended to make the owner's coverage primary and the Employers non-owned coverage excess in those situations in which Xerox employees drove rented or non-owned automobiles.

The State Farm policy also contains a provision stating that "The insurance with respect to . . . a non-owned automobile, shall be excess over other insurance. . . ." However, the same clause goes on to state that there shall be no coverage at all if the non-owned vehicle is a rented automobile covered by other insurance which applies "in whole or in part" to the loss. Thus, the State Farm policy contains an excess clause for non-owned vehicles plus an escape clause applying to rented vehicles which have any other coverage, regardless of amount. If we were dealing with two excess clauses, the solution would be quite simple. In Arizona,

> . . . where two policies cover the same occurrence and both contain "other insurance" clauses, the excess insurance provisions are mutually repugnant and must be disregarded. Each insurer is then liable for a prorata share of the settlement or judgment.

*Harbor Insurance Co. v. United Services Automobile Association*, 114 Ariz. 58, 63, 559 P.2d 178, 183 (App.1976) (dealing with two true excess clauses). This is also the general rule throughout the country. *See* 8A J. APPLEMAN, INSURANCE LAW AND PRACTICE § 4909 at 396. No other rule is possible, since if a court were to give literal effect to each of the excess clauses, each policy would be cancelled out and the final result would depend upon which policy was read first.[1] *Sloviaczek v. Estate of Puckett*, 98 Idaho at 374, 565 P.2d at 567.

However, the two clauses with which we deal here do not automatically cancel themselves out. 8A J. APPLEMAN, *supra*, § 4910 at 470. Under the peculiar facts of this accident the battle between insurers matches unequal contestants. Employers' entry is a true excess clause. The State Farm entry, on the other hand, is a combined excess-escape clause which excludes all non-owned coverage for rented automobiles whenever there is other insurance, regardless of whether the primary insurance covers all or only part of the entire loss, and regardless of whether any other excess insurance is sufficient to cover the entire loss. Thus, the weapons which arm the State Farm contestant in this battle are aimed not only at the other insurer but also at its own insured; if Employers provided only minimum coverage over Hertz, the insured would be personally liable for the excess judgment.

Since an excess clause and an escape clause are not intellectual equals, one may hold, as did the court of appeals, that the plain language of both must be given effect. The ultimate result is that the company armed with the escape clause pays nothing and the company girded only with the protection of its excess clause pays all. Cases which reach this result rely upon the language of the agreements and the so-called intent of the parties. *See* 8A J. APPLEMAN, *supra*, § 4910 at 473 n. 10. This was the approach of the court of appeals. *See* 149 Ariz. at 157, 717 P.2d at 461. This position encourages insurers to redraft "other insurance" clauses to achieve equality with other insurers, eventually resulting in mutually repugnant excess clauses. It also allows the carrier with the "escape" provision to unilaterally decrease the amount of

---

1. This result occurs because the "other insurance" clauses are triggered only when the other insurance is "available" or "collectible." Before one reads the other insurance clause in the second policy that policy is "available," so that the clause in the policy being read is triggered and the first policy becomes "unavailable."

insurance coverage provided to its insured. That problem does not exist in the present case, because there are three sources of indemnity, but might be a serious problem in the majority of cases. It might, for instance, come as a shock to the average Hertz customer who had bought one million dollars in *non-owned* auto coverage, to learn that his personal policy would not apply and that he was covered only to limits of $100,000 for each person he injured while driving a rental car. It would come as a greater shock if he discovered that the rental agency provided only the minimum coverage—$15,000—required of car rental agencies under A.R.S. § 28–324.

A number of courts have held that escape clauses are void and therefore unenforceable. *See* 8A J. APPLEMAN, *supra*, § 4910 at 476 n. 14. Other courts have held that such clauses are repugnant even to "unequal" excess clauses and require proration of the risk. *Id.* at 477 n. 15. The Applemans dislike this approach where "the policy terms are clear," but not where the provisions are not "crystal clear." *Id.* at 477–480.

These conflicts between policies containing an escape clause and others containing excess clauses have generated more litigation than any other type of "other insurance" problem. Comment, *supra*, 47 TUL. L.REV. at 1043. One court has described the diverse results in cases involving conflicts between escape and excess clauses as follows:

> One line of cases has resolved the conflict by imposing liability on the insurer whose policy contains the escape clause, reasoning that the policy with the excess clause does not in fact provide other valid and collectible insurance within the meaning of the escape clause of the other policy. [citations omitted] Other courts have taken precisely the opposite view, giving full effect to the escape clause and holding the insurer whose policy contains the excess clause primarily liable. These courts have taken the position that the existence of an excess poli-

cy is sufficient to relieve the policy with the escape clause from coverage. . . .

> Finally, the third group of cases has held that the conflicting clauses should be disregarded as mutually repugnant and the loss prorated according to the primary limits of liability of each policy. These cases candidly admit that the two clauses are irreconcilable, and that any attempt "[t]o solve the problem by picking up one policy, and reading it with the result which would be opposite to that reached if the other policy were first in order, is at best a pseudo-solution in that it only aggravates a circular riddle."

*State Farm v. United States Fidelity and Guaranty Co.*, 490 F.2d at 410–11, quoting from *Union Insurance Co. v. Iowa Hardware Mutual Insurance Co.*, 175 N.W.2d 413, 417 (Iowa 1970).

Arizona is sometimes placed on the list of states which have held escape clauses to be repugnant to excess clauses and required proration of the loss. *See State Farm v. United States Fidelity and Guaranty Co.*, 490 F.2d at 411, citing *Rocky Mountain Fire & Casualty Co. v. Allstate Insurance Co.*, 13 Ariz.App. 31, 474 P.2d 38 (1970). However, *Rocky Mountain* held that the escape clause in an owner's policy was invalid because it conflicted with the provisions of the Financial Responsibility Law, A.R.S. § 28–1101 *et seq. Id.*, 13 Ariz.App. at 35, 474 P.2d at 42. The escape clause in the present case is an exclusion from non-owned automobile coverage, which is not a statutory form of coverage. *See* A.R.S. § 28–1170. We are thus faced with a question of first impression.

## DISCUSSION

We hold that the escape clause before us cannot be given effect as written, that it must be treated as repugnant to the excess clause and the loss prorated between the two insurers. We "believe such a choice is supported by the better reasoning and accords with the growing weight of authority." *State Farm v. United States Fidelity and Guaranty Co.*, 490 F.2d at 411 (cita-

tions omitted). There are several reasons for adopting this view.

## CIRCULARITY

First, the problem of circularity is especially applicable to cases, such as the one before us, in which there actually is no primary insurance coverage at all. Hertz was a self-insurer, certified as such because, pursuant to A.R.S. § 28–1222(B), the director of insurance found that Hertz was financially responsible to pay damages assessed against *it*. A self-insured car rental agency is treated as primarily responsible for liability arising from the use of its rented cars. *State Farm Mutual Automobile Insurance Co. v. Agency Rent-A-Car, Inc.*, 139 Ariz. 201, 202, 677 P.2d 1309, 1310 (App.1983). This is a consequence of A.R.S. § 28–324(B), which makes the agency jointly and severally liable with the driver "for damage" when it rents cars without providing liability insurance. However, a "self-insurer is not an insurer. *A self-insurer does not insure liability other than its own.*" *Orkin Exterminating Co. v. Robles*, 128 Ariz. 132, 134, 624 P.2d 329, 331 (App.1981) (emphasis supplied) (citations omitted). Therefore, "other insurance" clauses are not triggered by the existence of primary, self-insured responsibility. *United National Insurance Company v. Philadelphia Gas Works*, 221 Pa.Super. 161, 163–165, 289 A.2d 179, 181 (1972); *Universal Underwriters Insurance Co. v. Marriott Homes, Inc.*, 286 Ala. 231, 238 So.2d 730, 732 (1970).

This principle was acknowledged by the trial judge in his minute entry order. The judgment rendered in the trial court did not attempt to prorate liability among excess carriers. The trial judge specifically held that each of the carriers provided primary insurance coverage and ordered that the loss be prorated between the two primary carriers.[2] The battle here, therefore, is not between two excess carriers that provide coverage above a primary limit, but between two insurers that provide primary coverage for the same occurrence, one of which seeks to avoid all liability by reason of the escape provision in its "other insurance" clause.

Thus, the clauses here chase each other through infinity. If we read the State Farm policy first, we must find it inapplicable because the existence of the Employers policy constitutes other "valid and collectible insurance", thus triggering State Farm's escape clause and making Employers the only carrier. If, however, we read the Employers policy first, then its excess provision is triggered by the existence of the State Farm policy. Under this situation, State Farm would provide primary insurance and Employers only excess coverage. As indicated by the foregoing discussion, this is not a rational method of solving the problem.

## INTENTION OF THE PARTIES—REASONABLE EXPECTATIONS

A second reason for our decision is our disagreement with the court of appeals' interpretation of the basic principle on which its "decision [was] based"—that "the intention of the parties should control." 149 Ariz. at 156, 717 P.2d at 460. The intention of the parties principle might govern in an action between the parties to the contract. In such an action, it would be appropriate to determine whether the parties had reached a meeting of the minds on a particular provision and, if they had, to decide the issue in accordance with their intent. That is not possible in this action because State Farm and Employers were

2. The record does not explain why there arose any question at all with regard to "other insurance" for the loss. Although the contract between Hertz and May contained a clause indicating that the "lessor provides liability coverage for customer ... in accordance with the standard provisions of [the basic policy] required in the jurisdiction in which the vehicle is operated" with limits of $100,000 for each person injured, the statute pertaining to car rental transactions (A.R.S. § 28–324) does not provide for such limitations. Subsection (B) indicates that an owner who rents a vehicle "without having procured the required public liability insurance, shall be jointly and severally liable with the renter for damage" caused by the renter's negligence.

not in privity of contract—the only parties to the contract are State Farm and May.

The court of appeals proceeded on the assumption that the parties to the State Farm policy intended that there be an exclusion for non-owned coverage whenever a rented car was covered by any other insurance. Except for the existence of the escape clause itself, there is nothing in the record to support the conclusion that when May bought non-owned coverage from State Farm, with no exclusion for driving rented cars, he intended that the "other insurance" clause, found ten pages later in the boilerplate, should contain a non-standard excess provision (see 8A J. APPLEMAN, supra, § 4910 at 457) terminating or excluding coverage if the rented car happened to be insured as required by law. If we are to make assumptions at all, we believe the more rational assumption would be that the average person who purchases non-owned automobile liability insurance with limits of $200,000 would reasonably expect to be covered in that amount when legally operating a non-owned automobile. We believe this expectation would be even stronger when the insuring clause indicates coverage and no exclusion is set forth.

We have previously alluded to the intention of the parties rule in cases where the boilerplate language conflicts with the reasonable expectations engendered by the conduct of the insurer. *Darner Motor Sales, Inc. v. Universal Underwriters Insurance Co.,* 140 Ariz. 383, 682 P.2d 388 (1984). The court of appeals found *Darner* inapplicable (see 149 Ariz. at 156 n. 2, 717 P.2d at 460 n. 2) and therefore relied upon the "intention of the parties" rule, citing the cases expressly criticized in *Darner.* We do not agree with this approach and believe the *Darner* rationale is applicable to the case before us.

It is true that in *Darner* we were presented with a factual situation in which the boilerplate clause negated the insurer's alleged express representation with respect to the amount of coverage. It is also true

that the case before us does not involve such an express representation. In our view, however, the distinction does not affect the result. It is true that an oral representation contrary to the words in the written instrument may qualify as either a fraudulent or negligent misrepresentation, but *Darner* does not by its terms limit itself to misrepresentation actions. We decline the invitation to so limit the decision. The provision in the declaration page [3] reflecting non-owned coverage in the amount of $300,000 certainly is an indication that the "dickered" or negotiated deal was the purchase of $300,000 in non-owned coverage. One of the basic principles which underlies *Darner* is simply that the language in the portion of the instrument that the customer is not ordinarily expected to read or understand ought not to be allowed to contradict the bargain made by the parties. 140 Ariz. at 391–92, 682 P.2d at 396–97.

That deal in *Darner* was allegedly made through the inquiry of the customer and representations of the agent. It may as easily be embodied, as is the case here, in the agent's contemporaneous documentation which supposedly reflects the expressed intent of the parties with respect to the important provisions of the transaction. That declaration page is later attached to the form or boilerplate provisions of the policy, which are ordinarily not discussed with the customer nor seen by him or her until the policy is later delivered.

In addition, *Darner* expressly adopted the rule of the Restatement (Second) of Contracts § 211. *Darner,* 140 Ariz. at 391, 682 P.2d at 396. *Darner* does not stand for the narrow proposition that § 211 is simply a remedy for misrepresentation. Remedies for misrepresentation already existed in the law. *Darner* is, rather, a methodology for interpretation of boilerplate provisions in transactions in which the seller of the product or service does business in such a way that the factfinder can conclude it is improbable that the customer will read or understand the boilerplate.

---

**3.** We use the term "declaration page" to refer to the cover sheet (or daily) to the policy, prepared by the agent at the time of the transaction and setting forth the nature and amount of coverage.

*See* Restatement (Second) of Contracts § 211, comment b. *Darner* gives the seller or provider of products and services carte blanche to reap the benefits from the efficiency of standardized transactions and to draw the boilerplate, not so much as contractual terms reflecting the intent of the parties but as rules which will govern the transaction. *Darner* recognizes that the boilerplate is ordinarily not truly negotiated. Nevertheless, except in certain situations, *Darner* gives a seller or provider of services freedom to make such rules. It requires the court to enforce such rules even though their existence was unknown to the customer and may operate to the detriment of the customer.

However, by adopting § 211 of the Restatement *Darner* also imposes restrictions on boilerplate provisions or rules; such provisions will not be enforced under the following circumstances:

f. *Terms excluded....* Although customers typically adhere to standardized agreements and are bound by them without even appearing to know the standard terms in detail, they are not bound to unknown terms which are beyond the range of reasonable expectation. A debtor who delivers a check to his creditor with the amount blank does not authorize the insertion of an infinite figure. Similarly, a party who adheres to the other party's standard terms does not assent to a term if the other party has reason to believe that the adhering party would not have accepted the agreement if he had known that the agreement contained the particular term. Such a belief or assumption may be shown by the prior negotiations or inferred from the circumstances. Reason to believe may be inferred from the fact that the term is bizarre or oppressive, from the fact that it eviscerates the non-standard terms ex-

plicitly agreed to, or from the fact that it eliminates the dominant purpose of the transaction. The inference is reinforced if the adhering party never had an opportunity to read the term, or if it is illegible or otherwise hidden from view. This rule is closely related to the policy against unconscionable terms and the rule of interpretation against the draftsman. See §§ 206 and 208.

Restatement (Second) of Contracts § 211, comment f.

■ As between the insured, May, and State Farm, several of these principles apply. First, the trial court, taking the policy as a whole, determined that the exclusion in question was ambiguous. We agree. The words of the clause itself are fairly clear.[4] However, taking the policy as a whole, the result is far from clear to an ordinary person. Someone reading the declaration page, which contains the "dickered deal," would find that the policy provides non-owned automobile coverage with limits of $100,000 per person injured and $300,000 per accident. If that person read the exclusion page which follows immediately thereafter, he or she would find no exclusion for driving rented automobiles. Ten pages later, at the end of the boilerplate, on a page headed "Conditions" is the clause entitled "Other Insurance." It follows a clause on "Return of Premium" and precedes one on "Arbitration." The "other insurance" clause contains slightly more than one column of small print and has different provisions for the various types of coverages (A through R1) which can be provided under the form policy in question. The specific exclusion upon which State Farm relies in the case before us is contained in a subparagraph applying to temporary substitute automobiles, trailers and non-owned automobiles. Even if found, this exclusion would have only questionable relevance to

---

4. "All of the foregoing provisions and all coverages are subject to the following:

   *    *    *    *    *    *

  (b) The insurance with respect to
    (i) a temporary substitute automobile,
    (ii) a trailer, or
    (iii) a non-owned automobile,
shall be excess over other insurance; however, NO COVERAGE SHALL APPLY TO ANY

LIABILITY OR LOSS IF THE VEHICLE IS OWNED BY ANY PERSON OR ORGANIZATION ENGAGED IN THE AUTOMOBILE BUSINESS AND IF THE INSURED OR OWNER HAS OTHER INSURANCE APPLICABLE IN WHOLE OR IN PART TO SUCH LIABILITY OR LOSS." (Emphasis in original.)

the facts presented by the case before us, since it applies only to automobiles owned by persons "engaged in the automobile business." Hertz is in the car rental business, so it is not abundantly clear that it falls within the exclusion at all. Only by flipping back from page 13, where the "other insurance" clause is located, to page 5 and looking under the definition provisions that apply to Section I of the policy does one find that "automobile business" means "the business or occupation of selling, leasing, ... storing or parking of land motor vehicles."

Given the clear indication of coverage in the declaration page of the policy, the lack of any exclusion in the exclusion portion of the policy, the non-standard nature of this other insurance clause, its location under "policy conditions" and the necessity to consult the definition clause in order to determine applicability, we cannot say that the trial court erred in concluding that the exclusion relied on by State Farm was ambiguous when the policy is considered as a whole, as it must be. *Sparks v. Republic National Life Insurance Company*, 132 Ariz. 529, 536, 647 P.2d 1127, 1134 (1982) *cert. denied* 459 U.S. 1070, 103 S.Ct. 490, 74 L.Ed.2d 632 (1983). This type of ambiguity is one which will justify non-enforcement under the *Darner* rule. *See Darner*, 140 Ariz. at 390–91, 682 P.2d at 396–97; Restatement (Second) of Contracts § 211; 3 A. CORBIN, CORBIN ON CONTRACTS § 582 (1960).

For similar reasons, we believe it quite clear that the clause in question also significantly modifies the "dickered deal" and could even be found unconscionable. The "dickered deal" was to buy $100,000/$300,000 in owned and non-owned auto coverage. Most informed policyholders would be shocked to discover that the substantial protection which they had purchased was reduced to the $15,000 minimum statutory coverage whenever they drove a rented car. Such an eventuality is certainly one that should be clearly called to the attention of the insured.

Thus, we conclude that as between May and State Farm, the proper interpretation of the policy would be that the escape clause is unenforceable. We believe that fact is entitled to great weight in determining the enforceability of the same clause in a dispute between State Farm and a nonparty, such as Employers.

## PUBLIC POLICY

Finally, we believe that the public policy of this state as expressed by the legislature does not favor escape clauses such as that contained in the State Farm policy. *See* A.R.S. § 28–1170.01(B); *State Farm Mutual Automobile Insurance Co. v. Fireman's Fund Insurance Co.*, 149 Ariz. 179, 717 P.2d 858 (1986). While that statute is not applicable to this case, the two-fold public policy it expresses is relevant. First, in order to avoid litigation the statute establishes firm rules determining priority between primary and excess coverage where there are multiple carriers. Second, it assures insofar as possible that the insurer for the negligent driver will bear part of the loss occasioned by the negligence of its insured. *Id.*, At 181 n. 1, 717 P.2d at 860 n. 1. We believe that both factors militate against enforcement of State Farm's escape clause.

## CONCLUSION

We hold, therefore, that the escape clause in the State Farm policy is repugnant to the excess clause in the Employers policy. The trial court was correct in its judgment of April 14, 1982, holding that both policies provide primary coverage and that, after deducting the amounts paid by Hertz, the amount of the loss must be prorated between the two carriers on the basis of five-sevenths to Employers and two-sevenths to State Farm.

The judgment is affirmed. The opinion of the court of appeals is vacated.

GORDON, V.C.J., and HAYS and CAMERON, JJ., concur.

HOLOHAN, C.J., dissents.