**EXECUTIVE RISK SPECIALTY INSURANCE COMPANY,**
Plaintiff

v.

**LEXINGTON INSURANCE COMPANY, Defendant.**

**No. CIV. A. 98–12493–RCL.**

United States District Court,
D. Massachusetts.

July 27, 2000.

■

Mark A. Rosen, Applegate, Valauskas & Rosen, Boston, MA, Lewis K. Loss, Jeffrey J. Ward, Ross, Dixon & Bell, L.L.P., Washington, DC, for Executive Risk Specialty Insurance Company.

Mark E. Cohen, Nicole M. Arangio, McCormack & Epstein, Boston, MA, for Lexington Insurance Company.

## MEMORANDUM AND ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

LINDSAY, District Judge.

This case involves a dispute between Executive Risk Specialty Insurance Company ("Executive Risk") and Lexington Insurance Company ("Lexington") over the allocation of insurance coverage for a loss that occurred when the companies had overlapping professional liability insurance policies in effect covering medical malpractice claims made against HealthPartners of Southern Arizona ("HealthPartners"), a health maintenance organization.

Executive Risk filed this action against Lexington for contribution and indemnification (Count One); subrogation and equitable subrogation (Count Two); and attorney's fees under Ariz.Rev.Stat. § 12–341.01 (Count Three). This court has diversity jurisdiction pursuant to 28 U.S.C. § 1332. Lexington and Executive Risk have filed cross motions for summary

judgment, each contending that the other is responsible for a portion of a loss suffered by HealthPartners, growing out of a medical malpractice claim made by one Joy Atkins ("Atkins"). The parties agree that Arizona law applies to this case, and that the underlying facts of the case are undisputed.

For the reasons set forth below, the court GRANTS the motion of Lexington for summary judgment and DENIES the motion of Executive Risk for summary judgment.

## I. Factual Background

In June, 1996, Atkins filed a medical malpractice suit against a number of parties, including HealthPartners in Pima County Superior Court in Arizona. As to HealthPartners, the Atkins lawsuit alleged that HealthPartners, Atkins's HMO, failed to approve in a timely fashion a CT scan of her brain that was requested by her primary care physician. The lawsuit further claimed that, while waiting for HealthPartners to approve the CT scan, Atkins suffered a brain aneurysm resulting in severe brain damage. The malpractice claim followed this episode and injury.

At the time the Atkins claim was made, HealthPartners had three managed care professional liability policies in place:

1. Lexington's Health Maintenance Organization Professional Liability Policy, a primary policy with a $1 million limit of liability, that was written for the January 1, 1996 to January 1, 1997 policy period ("Lexington $1 million policy"). HealthPartners cancelled this policy on July 16, 1996. The total premium charged for this policy was $100,176.[1]

2. Lexington's Professional Liability Follow Form Excess Policy, with a $9 million limit of liability, that was written for the January 1, 1996 to January 1, 1997 policy period ("Lexington $9 million policy"). HealthPartners cancelled this policy on July 16, 1996. Lexington charged a premium of $109,487 for this policy.

3. Executive Risk's Managed Care Errors & Omissions Policy, a primary policy with a $10 million limit of liability, effective from May 1, 1996 to May 1, 1997 ("Executive Risk policy"). The premium charged for this policy was $150,000.

The parties agree that the three policies were in effect during the time that the Atkins claim was made, and that the policies apply to the Atkins claim, subject to the exceptions discussed below.

The Atkins lawsuit was settled for $1,520,000 with the approval of the insurance carriers that are the parties to this case. Lexington paid $825,000 of the settlement and $175,000 in defense costs. It is undisputed that those payments fully exhausted the Lexington $1 million policy. The parties dispute whether the remaining amount of the Atkins settlement should be covered by the Lexington $9 million policy or the Executive Risk policy. To protect the interests of the insured pending resolution of the disputes, Executive Risk paid the balance of the settlement, $695,000, and an additional $10,087.77 in defense costs, subject to a reservation of its right to seek repayment from Lexington. Lexington refused to make any payment under its $9 million policy.

Lexington contends that resolution of the issue of which of the two policies in dispute should cover the balance of the settlement depends upon the context within which the policies were written. During the coverage period of the Lexington policies, HealthPartner's insurance broker asked Executive Risk to submit a quote for issuing a managed care organization professional liability insurance policy to

---

1. The parties have stated slightly different premium amounts for this policy, but the difference is not material.

HealthPartners. The relevant underwriters at Executive Risk knew at that time that HealthPartners was insured by Lexington, but those underwriters assumed that the Lexington policies would expire on May 1, 1996. The underwriters at Executive Risk learned, however, in June, 1996, after Executive Risk had issued the Executive Risk policy, that the two Lexington policies were still in effect. Catherine Lally, senior underwriter for Executive Risk, testified in deposition that it was not Executive Risk's practice to write coverage in the middle of another insurer's policy term, and that Executive Risk would not have agreed to issue its policy to HealthPartners for the May 1, 1996 to May 1, 1997 policy period had Executive Risk realized that there would be overlapping coverage between the Executive Risk and Lexington policies. *See* Deposition of Catherine Lally ("Lally Dep.") at 40, 70.

When Executive Risk learned that its policy overlapped with the Lexington policies, Lally had a conversation with Dan Diaz, the insurance broker for HealthPartners, in which Diaz asked whether Executive Risk was willing to entertain a change in the effective date of the Executive Risk policy, so that that policy would go into effect when the Lexington policies expired or were cancelled. *See* Lally Dep. at 13. Diaz told Lally that he would talk to the appropriate person at HealthPartners and let Lally know what HealthPartners wished to do about the term of the Executive Risk policy. *See id.* at 15. Diaz, however, never contacted Lally again about the matter. *See id.* Executive Risk, for its part, never did anything else to change the date of the Executive Risk policy. *See id.* at 18.

Lally also testified at deposition that the Executive Risk policy is "not an excess policy," and that "[i]t would provide primary coverage . . ." Lally Dep. at 45. She testified that neither the existence of the Lexington policies, nor Executive Risk's beliefs about the priority of coverage among the Lexington and Executive Risk policies played any role in Executive Risk's decision to insure HealthPartners or the manner in which Executive Risk determined the premium amount, because Executive Risk did not know that the Lexington policies overlapped with the Executive Risk policy. *See id.* at 23–24, 34, 70–71.

The Lexington $9 million policy provides that "upon the exhaustion of the applicable underlying limits of the underlying insurance policy as specified in Item II.A. of the Declarations by payments of expenses, judgments and settlements covered thereunder and hereunder, [Lexington] will pay on behalf of the insured the ultimate net loss in excess of such underlying limits so exhausted . . ." *See* Lex. $9 million policy, Section I (emphasis in original). Item II.A. of the Declarations of the Lexington $9 million policy lists only the Lexington $1 million policy as an underlying policy. *See id.* Item II.B. of the Declarations of the Lexington $9 million policy provides that the "[t]otal limits of all underlying insurance including the policy in excess of which this policy applies" is $1 million. *Id.*

Furthermore, the Lexington $9 million policy contains the following "other insurance" clause:

M.   OTHER INSURANCE:

The insurance afforded by this Policy is excess insurance, (except when required to apply as primary insurance because of the exhaustion of the limits of liability of the Underlying Policy scheduled in Item II.A. of the Declarations as the result of payments of judgments, settlements, and claims expenses), over the Underlying Insurance specified in Item II.A. of the Declarations whether or not such is collectible and over any other collectible primary insurance except where such is specifically written to be excess over the Policy.

When both this insurance and other insurance apply to the loss on the same basis whether primary, excess or contingent, the Company shall not be liable under this Policy for a greater propor-

tion of the loss than that stated in the applicable contribution provisions below:

1. Contribution by Equal Shares: If all of such other valid and collectible insurance provides for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than would be payable if each insurer contributes an equal share until the share of each insurer equals the lowest applicable Limit of Liability under any one Policy or the full amount of the loss is paid. With respect to any amount of loss not so paid, the remaining insurers then continue to contribute equal shares of the remaining amount of the loss until each such insurer has paid its limit in full or the full amount of the loss is paid.

2. Contribution by Limits: If any of such other insurance does not provide for contribution by equal shares, the Company shall not be liable for a greater proportion of such loss than the applicable Limit of Liability under this Policy for such loss bears to the total applicable Limit of Liability of all valid and collectible insurance against such loss.

Lex. $9 million policy, Section IV.(M).

In contrast, the Executive Risk policy contains the following "other insurance" clause:

(G) Other Insurance; Other Indemnification:

This Policy shall be excess of and shall not contribute with (1) any other existing insurance or self-insurance, unless such other insurance or self-insurance is specifically stated to be in excess of the Policy, and (2) any indemnification to which an **Insured** is entitled from any entity other than the **Insured Entity**. This Policy shall not be subject to the terms of any other policy of insurance or plan or program of self-insurance.

Executive Risk Policy, Section IV.(G) (emphasis in original).

## II. Discussion

### A. Arizona Law

The Arizona Supreme Court has observed that an "other insurance" clause in a policy of insurance "seek[s] 'to limit or eliminate coverage under the policy in the event the insured has other insurance available.'" *Fremont Indemnity Co. v. New England Reinsurance Co.*, 168 Ariz. 476, 477, 815 P.2d 403 (1991) (*quoting* A. Windt, Insurance Claims and Disputes: Representation of Insurance Companies and Insureds § 7.01 at 386 (2d ed.1988)). "Other insurance" clauses fall into three general categories: (1) excess clauses, which provide coverage only for amounts due after all other available insurance is exhausted; (2) pro rata clauses, limiting liability to the proportion that the insurer's policy limit bears to the aggregate of other available limits; and (3) escape clauses, which state that an otherwise applicable policy will afford no coverage at all if other insurance is available.[2] *See id.* at 478, 815 P.2d 403 (*citing State Farm Mut. Auto. Ins. Co. v. Bogart,* 149 Ariz. 145, 147, 717 P.2d 449 (1986)).

When more than one insurance policy applies to the claim and each policy contains an "other insurance" clause, the court must resolve the battle over which clause, if any, will be given effect over the other. If the clauses do not conflict, the court should apply the clauses as written. *See Dairyland Mut. Ins. Co. v. Andersen,* 102 Ariz. 515, 517, 433 P.2d 963 (1967). In *Dairyland,* the Arizona Supreme Court ruled that there was no conflict between a primary policy with a pro rata clause that provided that the policy would pay a proportion of the loss where there is other

---

**2.** In this case, neither party contends that its "other insurance" clause should be interpreted as an escape clause.

valid and collectible insurance, and a primary policy with an excess clause that provided, under the factual circumstances of the case, that its coverage was excess of any other insurance. *See id.* The court held that "the express words" of the policy with the excess clause required that the policy not come into play until the policy with the pro rata clause was exhausted. *Id. See also Allstate Insurance Co. v. Great American Insurance Companies,* —— Ariz. ——, 4 P.3d 991, 991–992 (App. 2000) (applying *Dairyland* to conflict between policy with pro rata "other insurance" clause and policy with excess "other insurance" clause).

In determining whether policies with "other insurance" clauses can be reconciled, Arizona courts often consider whether the policy as a whole should be considered a primary policy or an excess or umbrella policy. A policy is considered to be an excess or umbrella policy (the courts use the terms interchangeably)

> when the same insured has purchased underlying coverage for the same risk. This type of true excess (umbrella) policy provides, for a modest premium, coverage against catastrophic losses that exceed the limits of the underlying coverage. This excess insurance comes into play only after the limits of the same insured's primary coverage have been exhausted. With this type of coverage, the limits of the underlying policy operate as a kind of deductible, and an insured pays a reduced premium to the excess carrier expressly because that carrier will be obligated to pay a claim only after a certain amount has been paid by the insured's primary insurer.

*St. Paul Fire and Marine Ins. Co. v. Gilmore,* 168 Ariz. 159, 162, 812 P.2d 977 (1991) (citations and quotations omitted).

In a contest to apportion liability between an umbrella policy with an excess clause and a primary policy with an excess clause, the Arizona Court of Appeals has looked at the "total insuring intent" underlying the issuance of umbrella and primary

policies. *See United Services Automobile Assoc. v. Empire Fire and Marine Ins. Co.,* 134 Ariz. 64, 66, 653 P.2d 712 (App. 1982). The court held that the loss should be attributed to the primary policy because the umbrella policy, "fulfills the need to guard against a particularly large loss." *Id.* The court noted that "[u]nder no set of circumstances can [the umbrella policy] ever be primary insurance." *Id.* The court held that "[t]here is certainty and simplicity in a rule which holds insurers who issue residual protection only are last to pay so long as that is their expressed intent." *Id.*

When the outcome of a case depends on interpretation of a particular clause of the contract of insurance, the Arizona Supreme Court has rejected the view that the contract must be interpreted according to its plain language, and instead has adopted the Corbin view of contract interpretation. *See Taylor v. State Farm Mut. Automobile Ins. Co.,* 175 Ariz. 148, 152, 854 P.2d 1134 (1993). Under the Corbin view, "there is no need to make a preliminary finding of ambiguity before the judge considers extrinsic evidence." *Id.* (*citing* 3 Arthur L. Corbin, CORBIN ON CONTRACTS § 542 at 100–05 (1992 Supp.); Restatement (Second) of Contracts § 212 cmt. b (1979)). Rather, the court first should consider the extrinsic evidence, and if the court finds that the contract language is "reasonably susceptible" to the interpretation asserted by the party offering the evidence, the evidence is admissible to determine the meaning intended by the parties. *Id.* at 154, 854 P.2d 1134. Whether contract language is reasonably susceptible to more than one interpretation, so that extrinsic evidence is admissible, is a question of law for the court. *See id.* at 158–59, 854 P.2d 1134.

In addition, when a clause in a contract of insurance is subject to different interpretations, the Arizona Supreme Court has held that the court must "determine the meaning of the clause ... by examining the purpose of the exclusion in

question, the public policy considerations involved and the transaction as a whole." *Transamerica Ins. Group v. Meere*, 143 Ariz. 351, 355, 694 P.2d 181 (1984). Arizona courts have resolved disputes between insurance carriers over the interpretation of insurance contracts by applying the *Meere* factors as a matter of law if no facts are in dispute. *See, e.g., Skandia America Reinsurance Corp. v. St. Paul Fire & Marine Ins. Co.*, 951 F.2d 362, 1991 WL 275334 (9th Cir.1991) (table, applying Ariz. law) (deciding as a matter of law dispute between two insurance companies over how to interpret contract provision); *State Farm Mut. Automobile Ins. Co. v. Wilson*, 162 Ariz. 251, 782 P.2d 727 (1989) (interpreting contract as a matter of law where facts were undisputed); *Meere*, 143 Ariz. at 355–60, 694 P.2d 181 (same).[3]

## B. Analysis of the Present "Other Insurance" Clauses

Resolution of this case turns on the interpretation of the "other insurance" clause in the Lexington $9 million policy. Executive Risk contends that the Lexington $9 million policy became a primary policy when the settlement and defense costs of the Atkins lawsuit exhausted the limits of the Lexington $1 million policy. The "other insurance" clause of the Lexington $9 million policy states:

> The insurance afforded by this Policy is excess insurance, **(except when required to apply as primary insurance because of the exhaustion of the limits of liability of the Underlying Policy scheduled in Item II.A. of the Declarations as the result of payments of judgments, settlements, and claims expenses)**, over the Underlying Insurance specified in Item II.A. of the Declarations whether or not such is collectible and over any other collectible primary insurance except where such is specifi-

cally written to be excess over the Policy.

*See* Lex. $9 million policy, Section IV.(M) (emphasis added). Executive Risk notes that Item II.A. of the Lexington $9 million policy specifically identifies only the Lexington $1 million policy as the underlying policy as to which the Lexington $9 million policy is excess. Executive Risk also points out that Item II.B. of the Lexington $9 million policy provides that the "[t]otal limits of all underlying insurance," including the Lexington $1 million policy, in excess of which the Lexington $9 million policy applies, is $1 million. Based on the language in the clauses just described, Executive Risk argues that the Lexington $9 million policy and the Executive Risk policy both apply to the Atkins claim as primary policies.

Executive Risk further argues that the Lexington $9 million policy contemplates that that policy would become a primary policy upon exhaustion of the limits of the Lexington $1 million policy. Executive Risk points out that the Lexington $9 million "other insurance" clause states that if the $9 million policy and other insurance "apply to the loss on the same basis whether **primary,** excess or contingent," the loss should be apportioned on a pro rata basis. *See* Lex. $9 million policy, Section IV.(M) (emphasis added).

In light of that analysis, Executive Risk argues that the case boils down to a conflict between a primary policy with a pro rata "other insurance" clause and a primary policy with an excess "other insurance" clause. Executive Risk points out that its "other insurance" clause states that it "shall not contribute" with other insurance, unless that other insurance is "specifically stated to be excess of this Policy." Executive Risk policy, Section IV.(G). Executive Risk says that the out-

---

**3.** Indeed, courts have applied *Meere* in disputes between insurers in precisely the situation presented by the instant case, namely disputes over the allocation of a given loss. *See Skandia America Reinsurance Corp. v. St.* *Paul Fire & Marine Ins. Co.*, 951 F.2d 362, 1991 WL 275334, *4 (9th Cir.1991) (table; applying Ariz. law); *Westfield Ins. Co. v. Aetna Life & Casualty Co.*, 153 Ariz. 564, 569, 739 P.2d 218 (App.1987).

come for which it argues is required by the decision in *Dairyland,* 102 Ariz. at 517, 433 P.2d 963 (holding that a policy with an excess "other insurance" clause provides no coverage until a policy with a pro rata "other insurance" clause is exhausted).

In response, Lexington argues that Executive Risk's interpretation of the Lexington $9 million policy "other insurance" clause fails to account for the language in the clause that the policy is excess over "any ... collectible primary insurance," not just the Lexington $1 million policy specifically identified in the Lexington $9 million policy. Lexington further argues that if Lexington did not intend that its $9 million policy would be excess over primary policies, other than the Lexington $1 million policy, the latter part of the $9 million policy's "other insurance" clause would not serve any purpose. Lexington contends that the only sensible interpretation of its "other insurance" clause is that the $9 million policy will apply, as if it were primary coverage, only if the Lexington primary policy and any other collectible primary policy are exhausted.

Lexington further argues that the Lexington $9 million policy is a true excess policy, and therefore, should benefit from the general rule that coverage under a true excess policy applies only after all primary coverage has been exhausted. In support of this argument, Lexington points out that its $9 million policy is called a "Follow Form Excess Professional Liability Policy," and that the premium charged by Lexington for the Lexington $9 million policy was set only after Lexington considered the underlying primary coverage. The Lexington $9 million policy had a premium of only $109,487, in contrast to the Lexington $1 million policy, which had a $100,176 premium. Lexington also argues that Section II.B. of its $9 million policy, which provides for a total limit of $1 million on all underlying insurance, simply referred to the Lexington $1 million policy.

■ After considering the arguments outlined above, the court concludes that the "other insurance" clause in the Lexington $9 million policy is susceptible of more than one interpretation. Neither the interpretation offered by Executive Risk nor the interpretation offered by Lexington enables the court to give full effect to all of the language in the "other insurance" clause of the Lexington $9 million policy. Executive Risk's interpretation forces the court to disregard language in the clause that the Lexington $9 million policy is excess over "any ... collectible primary insurance." In contrast, Lexington's interpretation of the clause forces the court to disregard language that the policy "is excess insurance except when required to apply as primary insurance ..." (internal punctuation omitted). In such a situation, Arizona law requires that the court consider extrinsic evidence and resolve the case as matter of law by "examining the purpose of the [clause] in question, the public policy considerations involved and the transaction as a whole." *Meere,* 143 Ariz. at 355, 694 P.2d 181; *see also Taylor,* 175 Ariz. at 158–9, 854 P.2d 1134.

First, the purpose of the "other insurance" clause in the Lexington $9 million policy is to limit Lexington's liability in the event that Lexington and other insurance cover the same loss. When read as a whole, the clause seeks to avoid a call on the coverage if there is "any other collectible primary insurance," or to share the loss on a pro rata basis if the policy and other insurance apply on an equal basis. The clause indicates that when Lexington wrote the Lexington $9 million policy, it did not contemplate paying for an entire loss if other insurance were available to the insured.

Second, the public policy considerations weigh against Executive Risk. Executive Risk knew that its policy overlapped with both of Lexington's policies, but it did nothing to define or clarify the priority of coverage. That option was not available to Lexington because it issued its policies before the Executive Risk policy existed. As a sophisticated insurer with the oppor-

tunity to avoid the present dispute, Executive Risk should have taken steps to avoid the confusion, uncertainty and now the litigation produced by the overlapping policies. As a matter of sound policy, therefore, a party in the position of Executive Risk, relative to that of Lexington, should bear the risk of any doubt it could have avoided.

Third, examination of the transaction as a whole favors Lexington. It is undisputed that Lexington issued the Lexington $9 million policy as excess insurance over its $1 million policy. It appears that Lexington had a standard practice of issuing the first $1 million in coverage as a primary policy, and any amount over $1 million as an excess policy. *See* Deposition of Susan Angelo ("Angelo Dep.") at 27–28. Lexington issued the excess policy to HealthPartners partly because some of Lexington's reinsurers did not want to accept the risk of reinsuring primary coverage. *See* Supplemental Affidavit of Susan Angelo at ¶ 3. Furthermore, the Lexington underwriters did not know prior to issuing the Lexington $9 million policy that HealthPartners would obtain overlapping coverage. *See* Angelo Dep. at 41.

Viewing the undisputed facts as a whole, therefore, the "other insurance" clause of the Lexington $9 million policy should be interpreted as recognizing that the $9 million policy will serve as excess insurance, or at the very least, will cover a loss on a pro rata basis if other insurance applies to the claim.[4] It is undisputed that HealthPartners obtained the Executive Risk policy as a primary policy to replace both of the policies issued by Lexington. Thus, looking at the "total insuring intent" underlying the issuance of the two primary policies and excess policy, the Lexington $9 million excess policy should be the policy of last resort. *United Services,* 134 Ariz. at 66, 653 P.2d 712.

### III. Conclusion

This case represents a conflict between a true excess policy with a pro rata "other insurance" clause (the Lexington $9 million policy) and a primary policy with an excess "other insurance" clause (the Executive Risk policy). The generally accepted rule is that primary insurance should be exhausted before excess insurance must pay. *See, e.g., St. Paul Fire & Marine Ins. Co. v. Gilmore,* 168 Ariz. 159, 162, 812 P.2d 977 (1991) (true excess insurance "comes into play only after the limits of the same insured's primary coverage have been exhausted"); *United Services,* 134 Ariz. at 66, 653 P.2d 712 ("[t]here is certainty and simplicity in a rule which holds insurers who issue residual protection only are the last to pay so long as that is their expressed intent."). Accordingly, the court GRANTS Lexington's motion for summary judgment. The cross motion of Executive Risk for summary judgment is DENIED.

So ordered.

4. As noted earlier in this memorandum and order, *Meere* allows the court to interpret a contract as a matter of law when the facts are undisputed. *See* 143 Ariz. at 355, 694 P.2d 181.