938 P.2d 71 (1996)
189 Ariz. 22
MUTUAL INSURANCE COMPANY OF ARIZONA, Plaintiff-Appellant,
v.
AMERICAN CASUALTY COMPANY OF READING PENNSYLVANIA; National Casualty Company; Chicago Insurance Company, Defendants-Appellees.
No. 1 CA-CV 95-0116.
Court of Appeals of Arizona, Division 1, Department E.
August 22, 1996.
Reconsideration Denied October 17, 1997.
*72 Jones, Skelton & Hochuli by William R. Jones, Jr., Lori A. Shipley and David C. Lewis, Phoenix, for Appellant Mutual Insurance Company.
Jennings, Strouss & Salmon, P.L.C. by James M. Ackerman and Beale & Micheaels, P.C. by John A. Micheaels, Phoenix, for Appellee American Casualty Company.
Sorenson, Moore, Evens, Marshall & Rocco by Timothy W. Evens, Phoenix, for Appellee National Casualty Company.
Renaud, Cook & Drury, P.A. by J. Gordon Cook and Diane Mihalsky, Phoenix, for Appellee Chicago Insurance Company.

OPINION
THOMPSON, Judge.
Appellant Mutual Insurance Company of Arizona (MICA) sued Appellees American Casualty Company of Reading (American), National Casualty Company (National) and Chicago Insurance Company (Chicago) seeking reimbursement of settlement monies based on theories of contribution, indemnity, equitable subrogation and bad faith. The trial court granted appellees' motions for summary judgment on all claims. MICA appeals the trial court's entry of summary judgment on the contribution and equitable subrogation claims. For the following reasons, we reverse and remand.

FACTS AND PROCEDURAL HISTORY
On June 27, 1987, Terry Musil (Musil) was admitted to Phoenix Baptist Hospital (Phoenix Hospital) due to complaints of chest pain. A hospital cardiologist, Dr. Stuart Biliack (Biliack), diagnosed her with acute myocardial infarction. Musil was subsequently taken to Heart to Heart Medical Laboratories (Heart to Heart), a facility physically connected to Phoenix Hospital but maintaining a separate legal status. At Heart to Heart, Biliack performed a diagnostic heart catherization procedure on Musil. Following the procedure, Musil returned to Phoenix Hospital.
On July 6, 1987, Musil returned to Heart to Heart for an angioplasty to be performed by Biliack. During the operation, Judith Tourville (Tourville) served as the circulating nurse and Donna Craghan (Craghan) was the scrub nurse. A "dissection" or blush occurred in the right coronary artery during the angioplasty procedure. Craghan was aware of the blush. Following the angioplasty, Musil complained of soreness in her chest.
Later that day, Musil was transferred back to Phoenix Hospital. Phoenix Hospital Nurse Patricia Valentine received Musil from Nurses Tourville and Craghan. Neither nurse reported the blush to Nurse Valentine. Within eleven hours after her transfer, Musil's condition deteriorated to the point where she had to be taken to surgery by Biliack and Dr. David Goldfarb (Goldfarb). The preoperative diagnosis was pericardial tamponade, severe coronary heart disease with critical stenosis of the proximal right coronary artery and post-circulatory arrest. *73 Goldfarb successfully restored cardiac and pulmonary function, but Musil suffered significant loss of oxygen to the brain which left her in a comatose state.
Members of Musil's family subsequently sued Phoenix Hospital, Biliack, Goldfarb and Heart to Heart. Although the complaint referred to Tourville and Craghan as "having participated in the events giving rise to th[e] lawsuit," neither nurse was named in the suit. The complaint asserted that Heart to Heart was liable for the alleged negligence of its employees, Nurses Craghan and Tourville.
Heart to Heart was an additional named insured of a medical malpractice policy issued by MICA, which provided limits of $3,000,000 and yearly premiums in excess of $300,000. The MICA policy apparently also covered any employees of Heart to Heart, including Craghan and Tourville, as "additional insureds."
Nurse Tourville had a personal professional liability policy issued by American that provided liability limits of $500,000. The American policy had an annual premium of $38. Tourville also had a similar policy from National with limits of $1,000,000 and a yearly premium of $52.
Nurse Craghan had additional malpractice coverage under a personal professional policy issued by Chicago. The Chicago policy had a limit of $1,000,000 and a yearly premium of $58.
MICA retained an attorney, John C. West (West), to represent Heart to Heart in the Musil litigation.[1] National, Chicago and American were all advised of the litigation and invited to participate in settlement negotiations. National and American retained an attorney to represent Nurse Tourville. Chicago also retained an attorney to protect Nurse Craghan's interest. Both Craghan and Tourville instructed MICA to settle the case within the policy limits.
Prior to trial, MICA settled the Musil action for $1.4 million. Although the original draft of the settlement agreement and release did not name Craghan or Tourville, the final version included both nurses' names. The release was signed by the Musils, Heart to Heart, Goldfarb and Phoenix Radiology, but not by Tourville or Craghan.
MICA unilaterally decided to allocate 20% of the settlement to Goldfarb and 80% to Nurses Craghan and Tourville. MICA further allocated two-thirds of the nurses' purported share to Craghan and one-third to Tourville. MICA demanded that National, American and Chicago contribute their insureds' respective portions of the settlement. The three insurers did not reimburse MICA for its settlement of the Musil litigation, contending that they had no duty to pay because neither Craghan nor Tourville was named in the lawsuit.[2]
Subsequently, MICA brought suit against National, Chicago and American for indemnity, contribution and subrogation. The defendant-insurers moved for partial summary judgment. The trial court granted the motion and dismissed all of MICA's claims, except for the contribution claim, concluding that MICA "theoretically has an equitable contribution claim against the defendant insurance companies." After the parties provided additional briefing on the equitable contribution issue, the court dismissed that remaining claim, awarded attorneys' fees to the defendant-insurers and entered final judgment. MICA timely appealed.

DISCUSSION
MICA contends that the trial court erred in granting summary judgment on its equitable contribution claim.[3] The issues *74 presented in that claim, MICA argues, were decisively addressed by two previous Arizona cases, American Continental Ins. Co., Inc. v. American Casualty Co. of Reading, Pennsylvania, 183 Ariz. 301, 903 P.2d 609 (App.1995), review denied (Sept. 26, 1995), and Industrial Indemnity Co. v. Beeson, 132 Ariz. 503, 647 P.2d 634 (App.1982), appeal after remand, 153 Ariz. 317, 736 P.2d 800 (App. 1986). We agree.
This case is very similar to American Continental. There, a patient at John C. Lincoln Hospital received intramuscular injections from a hospital nurse while sitting, unsecured, on the edge of a gurney. 183 Ariz. at 301, 903 P.2d at 609. The standard of care requires that such injections be given while the patient is in a prone position. Id. After the second injection, the patient fell off the bed and struck his head on the floor, rendering him a quadriplegic. Id.
The patient subsequently filed suit against the hospital, the attending physician and Emergency Medical Consultants. Id. at 302, 903 P.2d at 610. The complaint referred to the negligence of the hospital's "employees and/or agents," but did not name the nurse as a defendant in the lawsuit. Id. Lincoln Hospital had two separate insurance policies which obligated Appellee American Continental Insurance Company, Inc. (ACIC) to defend and indemnify the insured against medical malpractice claims. Id. at 301-02, 903 P.2d at 609-10. Both policies defined "insured" as including Lincoln Hospital and its employees. Id. at 302, 903 P.2d at 610. The nurse was employed by Lincoln Hospital when the malpractice occurred and therefore was insured by ACIC. Id. She also had a personal professional liability policy issued by Appellant American Casualty Company of Reading (ACCR),[4] which provided overlapping insurance coverage. Id.
ACIC advised ACCR of the malpractice action and invited ACCR to participate in settlement talks, which it refused to do. Id. ACIC also demanded contribution and/or indemnity from ACCR. Id. After ACIC settled the lawsuit, it sued ACCR, seeking recovery for a portion of settlement costs based on theories of indemnity, equitable contribution, statutory contribution, equitable subrogation and bad faith. Id. ACCR moved for summary judgment on all counts. Id. ACIC filed a cross-motion for summary judgment which the trial court granted, ruling that ACIC was entitled to seek equitable contribution. Id. ACIC and ACCR stipulated that the settlement of the malpractice suit was reasonable, and that 50% of Lincoln Hospital's liability arose from the nurse's negligence. Id.
In its appeal, ACCR argued that ACIC could not require contribution from ACCR because the nurse was never sued in the underlying action; thus she never faced any liability or obligation to pay damages. Id. Consequently, ACCR claimed that it had no obligation to defend or indemnify its insured. Id. Division Two of this court disagreed, and held that, notwithstanding the fact that the nurse was not named in the underlying malpractice action, ACIC was entitled to equitable contribution from ACCR. Id. at 303, 903 P.2d at 611. In reaching this conclusion, the court identified three elements that must be satisfied to establish an equitable contribution claim: (1) the two insurers must insure the same risk; (2) neither can be the primary insurer; and (3) the loss sustained must be caused by the risk insured against.[5]Id.
Application of the American Continental analysis to the present facts dictates a similar result. Indeed, the appellees-insurers make the same basic argument rejected by Division Two. All three insurers contend *75 that their respective insurance policies provided coverage only in the event that their insured was exposed to liability or obligated to pay damages. Because neither Craghan nor Tourville was a named defendant in the Musil litigation, appellees assert that the risk insured against in their similarly-worded professional liability insurance policies (i.e., the nurses being sued and held liable) never arose. They contend that MICA's policy insured against a different risk (i.e., vicarious liability of Heart to Heart), and that risk materialized.[6] The court in American Continental rightly stated that "[i]n determining whether a claim for equitable contribution may lie, we see no reason why the question should be limited to whether a claim was made or a lawsuit filed against the insured." Id.
We find Division Two's reasoning to be persuasive. Where two or more insurers share responsibility for a loss, it should not be left to the discretion of the loss claimant to decide which insurer should pay the entire claim. As Division Two noted, such a result would give the insurer an incentive "to avoid paying a just claim in hopes that the claimant will obtain payment from the co-[insurer]." Id. (quoting California Food Serv. Corp. v. Great Am. Ins. Co., 130 Cal.App.3d 892, 182 Cal.Rptr. 67, 72-73 (1982)).
Further, we believe that MICA's policy and the professional liability policies issued by appellees insured the same risk. The trial court found it "likely that when someone like nurse [Tourville or Craghan] buys a separate policy to insure her, it is to protect her only when she herself gets sued either by the plaintiff in the underlying suit or by her employer." However, as correctly recognized in Beeson, the risk insured in such professional policies is the actual negligence of the insured, not simply the filing of litigation claims against the insured. 132 Ariz. at 508, 647 P.2d at 639.
Indeed, the appellees-insurers' obligations to the nurses did not arise solely upon the initiation of a lawsuit. While the duty to indemnify is not implicated until after a malpractice action is filed and liability has been established, insurers may become obligated to settle claims against their insureds even though legal action has not yet been initiated. See Smith v. Blackwell, 14 Kan. App.2d 158, 791 P.2d 1343, 1346-47 (1989) (insurer can be held liable for bad faith in failing to settle before commencement of litigation).[7]
Appellees contend that American Continental has little, if any, persuasive force because Division Two did not address whether the malpractice policies insured the same "interest." Prior Arizona case law establishes that in order for there to be equitable contribution among insurers, the policies must cover: (1) the same parties; (2) in the same interest; (3) in the same property; and (4) against the same casualty. Western Agric., 172 Ariz. at 594, 838 P.2d at 1355; Granite State Ins. Co. v. Employers Mut. Ins. Co., 125 Ariz. 275, 278, 609 P.2d 90, 93 *76 (App.1980). Appellees argue that MICA paid the settlement monies solely to protect the interest of Heart to Heart against vicarious liability for medical malpractice, and that their individual policies protected only the nurses for sums they may become legally obligated to pay. We disagree.
While American Continental does not discuss the "interest" covered in the malpractice policies, Division Two does therein characterize the analysis we employed in Western Agric., which included the "same interest" prong, as "similar" to its own analysis. 183 Ariz. at 303, 903 P.2d at 611. Although the equitable contribution considerations announced in these cases are not identical, we find that both tests employ substantially similar analyses, and that, under either test, MICA has a right to bring an equitable contribution claim against appellees.
The "interest" which MICA sought to protect when it paid the settlement monies was that of its insured, Heart to Heart, and its "additional insureds," Doctor Goldfarb and Nurses Craghan and Tourville. The nurses' interest under their personal professional policies and MICA's policy is to be protected against malpractice claims. When the Musils brought suit because of the nurses' alleged negligence, that interest was triggered, whether Craghan or Tourville were named in the lawsuit or whether the nurses desired to be included in the settlement agreement.
We find therefore that MICA is entitled to pursue its equitable contribution claim against appellees for reimbursement of the underlying settlement in the Musil litigation, especially given that MICA's settlement protected the nurses from ever becoming parties to the lawsuit. However, before MICA may recover contribution from any of the appellees, it must be able to establish the negligence of the mutual insured, Craghan or Tourville.[8]American Continental, 183 Ariz. at 303, 903 P.2d at 611. Given our resolution of the equitable contribution claim, we do not reach the issue of whether the trial court erred in dismissing MICA's claim for equitable subrogation.
We deny all parties' requests for attorneys' fees because a final judgment has not been reached in this case. While MICA has achieved a reversal of an unfavorable trial court order, we do not believe that this appeal may be deemed a "separate unit" under Wagenseller v. Scottsdale Memorial Hosp., 147 Ariz. 370, 393-94, 710 P.2d 1025, 1048-49 (1985), as MICA contends.

CONCLUSION
For the foregoing reasons, the trial court's order granting summary judgment to appellees is reversed and the matter remanded for further proceedings consistent with this decision.
GERBER, P.J., and VOSS, J., concur.
NOTES
[1] MICA asserts that West represented both Heart to Heart and its employees, Nurses Tourville and Craghan.
[2] Chicago apparently was the only insurer that showed a willingness to contribute to the settlement, offering $87,500 to MICA in June 1992.
[3] In reviewing a summary judgment, we view the facts and evidence in the light most favorable to the party against whom summary judgment was granted, and draw all reasonable inferences in favor of that party. West v. Salt River Agric. Improvement & Power Dist., 179 Ariz. 619, 623, 880 P.2d 1165, 1169 (App.1994). MICA argues that this standard does not apply to review of dismissal of the contribution claim. It contends that the standard of review should be the same as for a motion to dismiss for failure to state a claim. We find no factual or legal basis for applying a different standard than the one usually applied in review of a summary judgment.
[4] The insurance carrier involved in American Continental is also one of the three appellees in this appeal. To prevent any possible confusion, that carrier is designated "ACCR" when referring to the American Continental opinion, and is designated "American" when discussing the present appeal.
[5] Division Two relied on Beeson for this test. 132 Ariz. at 508, 647 P.2d at 639. The court also cited similar analysis from another case, Western Agric. Ins. Co. v. Industrial Indem. Ins. Co., 172 Ariz. 592, 838 P.2d 1353 (App. 1992), which Chicago and American discuss in the instant case.
[6] Chicago concedes that the risk insured by its policy was a malpractice claim, and that MICA insured the same risk. It asserts that the "interest" MICA was obligated to protect when it settled the Musil litigation was the vicarious responsibility of Heart to Heart.
[7] The Smith holding is entirely consistent with Arizona law. It is well-established that insurance carriers owe their insureds a duty to treat settlement proposals with due consideration. State Farm Mut. Auto. Ins. Co. v. Peaton, 168 Ariz. 184, 192, 812 P.2d 1002, 1010 (App.1990). This duty exists separate and apart from the duty to defend. Equity Gen. Ins. Co. v. C & A Realty Co., 148 Ariz. 515, 519, 715 P.2d 768, 772 (App. 1985). The duty to defend is generally determined by the face of the complaint, Salvatierra v. National Indem. Co., 133 Ariz. 16, 19, 648 P.2d 131, 134 (App.1982), whereas the duty to consider offers of settlement "arises out of the insurer's obligation to give equal consideration to its own and the insured's comparative hazards." Equity Gen., 148 Ariz. at 518, 715 P.2d at 771. As such, the duty of an insurance carrier to settle claims against its insureds may exist before any legal action has been formally initiated. See Brisco v. Meritplan Ins. Co., 132 Ariz. 72, 74, 643 P.2d 1042, 1044 (App.1982) (liability insurer owes its insured a good faith duty to terminate a claim against its insured by settlement).

This court's dictum in Cagle v. Home Ins. Co., 14 Ariz.App. 360, 483 P.2d 592 (1971), also supports the proposition that in Arizona an insurer's duty to settle may arise before any lawsuit has been filed. In Cagle, where the opportunity to settle arose before the insured was sued, we noted that "[t]he failure of an insurance company in good faith to settle in a clear case, may result in its liability over and above the policy limits." Id. at 367 n. 2, 483 P.2d at 599 n. 2.
[8] American asserts, as an alternate ground to support the trial court judgment, that there is no evidence that Nurse Tourville was negligent. MICA claims that it mutually agreed with American to postpone the time to brief this issue. Because we reverse the judgment of the trial court and remand for proceedings consistent with this decision, we leave it to the trial court to determine whether the nurses' liability has been established.